IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEONARD E. THOMPSON,<br><br>　　　　Petitioner,<br><br>　　v.<br><br>KENNETH HARRINGTON, Warden,<br><br>　　　　Respondent.　　　　　　　／ | No. C-10-3263 EMC (pr)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY** |

Leonard E. Thompson filed this *pro se* action seeking a writ of habeas corpus under 28 U.S.C. § 2254, challenging his state conviction. The matter is now before the Court for consideration of the merits of the habeas petition.[1] For the reasons discussed below, the petition will be denied.

## I. BACKGROUND

A Lake County jury found Thompson guilty of first degree murder and false imprisonment. The jury also found true the allegations that Thompson intentionally and personally discharged a firearm in the commission of the murder, and personally used a semiautomatic handgun in the commission of the false imprisonment charge. Thompson was sentenced to an aggregate term of fifty years to life in state prison. On appeal, his conviction was affirmed by the California Court of Appeal and his petition for review was denied by the California Supreme Court.

---

[1] This case was reassigned to this Court on September 27, 2011.

Thompson does not dispute the following facts, which are excerpted from the opinion of the California Court of Appeal:

### A.  The People's case

#### 1.  Testimony of Dorothy Green

Dorothy Green was a close friend of the victim, Garysha Moore, [FN2] who had begun dating Thompson in 2000. From 2000 until 2002, Green believed the relationship between Moore and Thompson was "pretty good." Beginning in 2000, Moore was participating in Job Corps and spending the night at its campus in San Jose. When Moore stopped going to Job Corps, it appeared to Green that Moore and Thompson were more "distant" with each other, and they were doing less "girlfriend/boyfriend stuff." At this point, Moore was staying with Green, rather than going home to her mother's house, and Green believed that Thompson was jealous of her. On multiple occasions, Green heard Thompson accuse Moore of cheating on him, and at least once, Thompson accused Moore of having a sexual relationship with Green.

> FN2. Moore was also known as "Pussycat."

On numerous occasions, Thompson would take Moore's phone, purse and keys to prevent her from leaving. He would also get mad at Moore and say, "You [*sic*] always trying to run with that bitch [i.e., Green] somewhere. Why you [*sic*] can't stay here with me." Thompson would also follow Green and Moore around, or wait outside Green's house for the two to return home. Moore would appear to be disgusted or angered by Thompson's behavior in this regard.

In 2003, Moore and Thompson both lived with Green for approximately one month. During that time, Green saw that they were not getting along well, arguing about "[s]tupid things. [Moore] being gone for so long. Why she didn't answer her phone. Where were we." Green believed that Thompson was trying to control Moore. Though Moore did not seem to be happy with the relationship, she continued to play the "boyfriend/girlfriend" role with Thompson.

One night, Moore and Green went to a club together to get away from Thompson and Thompson kept calling them on the phone. Afterwards, they parked about two blocks away from the house, then went home. At about 5:00 a.m., Thompson began pounding on Green's door, saying, "I know you bitches are in there. The light is on. Open the door." Thompson left after a neighbor threatened to call the police.

On or about Valentine's Day in 2003, Moore and Green had driven to San Francisco together and were in the drive-thru lane of a McDonald's restaurant when they were suddenly accosted by Thompson. Thompson began yelling and screaming at Moore, "Why are you down here? I told you don't come down here." He

2

ordered her to get out of the car, and when she refused, he dove in through the passenger window of Green's car. Moore jumped into the rear seat, telling him to get out and that she did not want to go with him. Thompson then pulled out a gun, which he pointed at Green, telling her to start the car and drive off. Thompson and Moore began to argue, and Thompson told her that if she left him, he would kill her. While they were arguing, Green jumped out of the car and started to run, but came back when she heard Moore screaming for her to come back. Moore eventually did go with Thompson, but then tried to run back and he grabbed her. Green did not call the police about this incident.

A number of weeks after the incident at the McDonald's, Moore and her family moved from East Palo Alto to Milpitas. Green stayed over at Moore's house every evening after the move. Thompson, who had previously shared a room with Moore at her house in East Palo Alto, was still occasionally spending the night with her in Milpitas, though less often than he had before.

On the afternoon of May 18, 2003, Green and Moore went to East Palo Alto to pick up money and a car that Moore shared with Thompson. Thompson came along for some period of time, but Green and Moore later dropped him off and continued to the mall without him. After shopping, Green and Moore dropped Thompson's car off with him at the end of the day, then the two of them returned to Moore's house in Milpitas. At some point that evening, Thompson called Moore on her cell phone. Green, who was sitting close to Moore, could hear Thompson yelling at Moore, asking why Green was still there and saying, "She need [*sic*] to be going home. I was going to come over [there] but whatever."

After Moore hung up the phone, Thompson called Moore's mother, Alonda Crooks. Green overheard Crooks tell Thompson, "Boy, shut up. And I'll talk to you later."

Green and Moore slept in the same bed that night. The next morning, they started talking about their plans for the day and watching television, when someone began to bang on the front door. Moore looked out the window and said, "Oh, it's just [Thompson]." She went downstairs and let him in, then returned to the bedroom and got back on the bed with Green. Thompson came into the room about five minutes later and sat down in a chair by the window. Green and Moore continued to watch television and talk and laugh together. At some point, Thompson asked to talk to Moore privately and the two left the room. When they returned, Moore was laughing as if something Thompson had said was funny. She sat down on the bed again and resumed talking to Green, while Thompson sat down in the chair again. He watched television with Green and Moore for a little while, then got up as if he were walking out of the room. He pulled a gun out of his pocked and pointed it at Green's head.

Green yelled at him, "What are you doing? Don't play with me. I don't like guns." Thompson responded, "Bitch, shut up. I'm going

3

to kill your bitch ass. I hate you." Moore began yelling at Thompson, "Don't do that to her. Don't play with her like that." Thompson told Moore to "shut the fuck up," and said "he wasn't playing." He pulled the trigger twice, but the gun did not fire.

Thompson then started hitting Green on the head with the gun, and she fell to the floor. He was dragging and pulling her, but she was able to get away when Thompson began to chase after Moore. Green ran into another bedroom to call 911, but Thompson came back for her and continued to beat her. Moore's younger brothers, who were in the second bedroom, attempted to help Green.

Moore pleaded with Thompson to stop hitting Green, and when he left Green against a wall in the second bedroom, Moore came in and cradled her in her arms, telling her it would be "ok." Thompson began to yell at Moore, "Get up. Fuck her. Leave her. Get up." Moore did not move, and said, "I'm not leaving her. She's hurt. And I need to call my mom for help." Thompson repeated himself, telling Moore to leave Green where she was. Moore refused, and Thompson shot her. Moore fell on top of Green, and Green does not remember what happened after that.

The People played an audiotape of a 911 call made immediately after the shooting. Green testified that she did not remember making the call, but acknowledged it was her voice on the recording. In that call, Green told police that Thompson had tried to shoot her and that he had shot and killed Moore.

### 2. *Theodore and Cindy Winterbauer*

On the night of May 17, 2003, Theodore Winterbauer invited some friends, including Thompson, over to his house for a barbecue. Thompson spent up to 20 minutes in Winterbauer's bedroom, ostensibly to get his coat or change his clothes. Winterbauer kept a loaded 9mm handgun in a locked case in his bedroom. When Winterbauer later learned that Moore had been shot two days after the barbecue, he checked to see if his gun was missing, and it was. Thompson had not asked Winterbauer if he could take the gun, nor did Winterbauer give him permission to do so. When shown a digital image of the gun which was used to kill Moore, Winterbauer said that it was his.

Cindy Winterbauer testified Thompson spoke to her at the barbecue and told her that he and Moore were having problems. He wanted Moore to spend more time with him.

### 3. *Eric Jones*

Eric Jones, one of Moore's younger brothers, testified that he woke up on the morning of May 19, 2003, because he heard fighting in the house. He ran into his mother's bedroom where he found three of his brothers, along with Moore, Green and Thompson. He saw Green sitting by the closet, crying, and Moore was hugging her. Thompson was standing over the two of them,

two to three feet away, and Jones saw him pull a gun out of his right pocket and shoot Moore. Thompson then put the gun under he chin and shot himself. After that, Thompson, dazed and his face bleeding, seemed to be looking for the gun which he had dropped after shooting himself. Jones heard him ask, "Where is the gun?" Thompson left the room and went downstairs, but came back with a knife, which he used to cut his wrist.

### 4.  Alonda Crooks

Crooks testified that Moore and Thompson dated for approximately three years before the shooting, and that while it began well, the relationship changed in the last year or two. The two began arguing and fighting. Thompson would complain about Moore not spending enough time with him and was upset that she spent so much time with Green.

On the night before the shooting, Thompson called Crooks and told her that something bad would happen the next day. Crooks asked what he was talking about and he said he would "do something to hurt [Green]." Thompson said he was going to shoot Green and then shoot himself. Crooks, who felt she knew Thompson well, thought that he was just "talking big" and did not think anything of his threat.

### 5.  Officers Dennis Kraft and Mark Doyle

Officer Dennis Kraft testified that he responded to a call of a disturbance and made contact with Green down the street from Crook's house. Green appeared to be hysterical and was bloody, though she told Officer Kraft she was not injured. When he arrived at Crook's house, Officer Kraft observed Thompson partially hanging out of an upstairs window. Thompson had blood on his hands and face. Officer Kraft asked him where the woman was, and Thompson responded that he had shot her and that she was dead. Thompson repeatedly told Officer Kraft, and the other officers who had arrived on the scene, that he wanted them to shoot him. Thompson came out of the house and was handcuffed. While handcuffing him, Officer Kraft noted that Thompson had many cuts on both arms, some as long as three inches. He also saw that he was bleeding heavily due to major trauma to his jaw area, though he could not tell if it was caused by a gunshot.

Officer Mark Doyle was standing near Thompson after he had been handcuffed and heard Officer Kraft ask Thompson, "What happened today?" Officer Doyle did not hear any response, but as he got closer to Thompson, he could hear Thompson mumbling, and heard the word "note." At the same time, Thompson, who was lying on his side on the ground, gestured towards his right front pocket. One of the officers retrieved a note from Thompson's pocket. There was no blood or smudges on the note. The note itself appeared to have been written in both ink and pencil.

Thompson's signature appeared on one side of the note, [FN3]

5

>along with the following: "I Love pussycat"; "to all my G-Town homes *Im* sorry. See what love did to me. Fuck the world. If I *cant* have her no one can"; "I was not *playin what I say*"; "all because of *dorthy*"; "*Im* going to miss everybody"; "put *use side by sid* when we die"; and "fuck it." The other side of the note reads as follows: "give *ted the my car*"; "this for everybody that love *use*. I did this *becous dorthy* is in the way. I *cant spin* no time with pussycat *becaus* she *all ways ther*, pussycat is the only girl that I ever loved. I hope everybody *dont for get* me. I will kill for her. All of this is because *dorthy*. Love everybody."
>
>>FN3. Italicized portions denote spelling and grammatical errors in the original.
>
>### 6. Forensic evidence
>
>The autopsy revealed that Moore was killed by a single gunshot to the head, which lacerated her brainstem, resulting in instantaneous death. The gun was fired from close range, anywhere from one inch to three feet away. The murder weapon was the gun taken from Winterbauer's residence.
>
>### B. *The defense case*
>
>Thompson offered no evidence in his defense. His counsel acknowledged that Thompson had killed Moore, but argued that his crime was voluntary manslaughter, not murder, because the killing was a rash and impulsive act, carried out in the heat of passion.

Cal. Ct. App. Opinion ("Op."), pp. 2-8; Ex. C.[2]

## II. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Lake County, California, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## III. EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim

---

[2] Citations to "Ex." are to the record lodged with the Court by the Attorney General.

6

they seek to raise in federal court. *See* 28 U.S.C. § 2254(b), (c). The parties do not dispute that the state judicial remedies were exhausted for the claims in the petition.

## IV. STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

## V. DISCUSSION

As grounds for habeas relief, Thompson claims that he was denied due process because

7

of a jury instructional error and prosecutorial misconduct related to the provocation element of the lesser included offense of voluntary manslaughter. Specifically, Thompson alleges that during his closing and rebuttal statements, the prosecutor repeatedly misstated the law and thereby misled the jury into believing that the provocation necessary to support voluntary manslaughter must have been sufficient to induce an ordinary person to kill rather than merely to act rashly. Thompson also asserts that the jury instruction on provocation was ambiguous, which contributed to the jury misunderstanding the law.

A.  Prosecutorial Misconduct

The Court of Appeal summarized what occurred at trial with respect to the prosecutor's alleged misconduct, and found that the prosecutor did misstate the law regarding the provocation element of voluntary manslaughter.

> *A.   Claims relating to the provocation element of voluntary manslaughter*
>
> *1.   Prosecutor's statements regarding provocation*
>
> In opening argument, the prosecutor stated that the element of provocation, in the context of voluntary manslaughter, "requires that the defendant be provoked. And as a result of that provocation, the defendant acts rashly and under the influence of intense emotion... [t]hat is acting out of passion rather than judgment." The prosecutor expanded on this concept by stating, "What that means is the person such as you, average person of average disposition, would you kill because of such a provocation? [¶]... [T]he fact is, if you try to argue provocation, you, ladies and gentlemen, need to sit there and say, if there was any sort of provocation, would it cause me to kill."
>
> Defense counsel objected, but the objection was overruled by the trial court. The prosecutor continued, "So you need to ask yourselves would this cause the average person to kill? [¶] Would this cause me to kill? [¶] If not, it's not voluntary manslaughter."
>
> After defense counsel argued to the jury that the standard did not "mean that the average person would have to commit an unlawful killing," the prosecutor's closing argument reiterated that, in order for the crime to be voluntary manslaughter instead of murder, the events described would have to "comprise[] provocation that would lead someone to kill," and that even the events described at trial did not "rise to the level where you or me or society would consider it enough to provoke someone to kill."
>
> Thompson contends that the prosecution's argument repeatedly misstated the law regarding the provocation element of voluntary

8

manslaughter. We agree.

A defendant commits voluntary manslaughter, not murder, when he or she unlawfully kills another person "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) "The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively.... '[*T*]*his heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances*,' because 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, *unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man*.'" (*People v. Steele* (2002) 27 Cal.4th 1230, 1252-1253, italics added.)

In *People v. Najera* (2006) 138 Cal.App.4th 212 (*Najera*), the trial court instructed the jury on voluntary manslaughter. In arguing the case to the jury, the prosecutor focused on the killer's response to the provocation, contending that it was disproportionate as the provocation would not cause an average person to kill. On appeal, the court concluded that this argument was erroneous and improper, explaining that "[t]he focus [of a heat of passion defense] is on the provocation -- the surrounding circumstances -- and whether it was sufficient to cause a reasonable person to act rashly. How the killer responded to the provocation and the reasonableness of the response is not relevant to sudden quarrel or heat of passion." [FN4] (*Id.* at p. 223.)

> FN4. The court in *Najera* reached this issue despite having concluded that the defendant forfeited his claim of prosecutorial misconduct by failing to object at trial. (*Najera, supra*, 138 Cal.App.4th at p.224.) The court also rejected defendant's claim of ineffective assistance of counsel based on the failure to object to the prosecutor's misstatements, concluding the failure to object was necessarily harmless because there was insufficient evidence of provocation to warrant voluntary manslaughter instructions in the first place. (*Id.* at pp. 225-226.)

This analysis reinforces the long-standing, qualitative standard for provocation; i.e., that it be sufficient to cause an ordinarily reasonable person to act from passion rather than judgment. (See *People v. Logan* (1917) 175 Cal. 45, 49 [provocation "sufficient to arouse the passions of the ordinarily reasonable man"]; *People v. Manriquez* (2005) 37 Cal.4th 547, 583-584 [conduct "sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection"].) More importantly, the *Najera* analysis protects the qualitative standard from being distorted by the quantitative notion that provocation must reasonably trigger a certain heightened level of reactive conduct, specifically lethal force, in order to reduce murder to manslaughter. Such a notion is erroneous. What negates malice is simply *a state of mind obscured by passion*. (*People v. Carasi* (2008) 44 Cal.4th 1263,

9

> 1306.) The state of mind can be induced by any violent, intense, or enthusiastic emotion, except revenge, including anger, rage, and fear of death or bodily harm. (*People v. Lasko* (2000) 23 Cal.4th 101, 108.) Thus, in the context of voluntary manslaughter, provocation is sufficient if it would trigger such a state of mind in a reasonable person. It need not further cause a particular *level* of conduct, let alone cause a reasonable person to react with lethal violence.
>
> Accordingly, the prosecutor's statements were incorrect and constituted misconduct. We note that the court, following California Criminal Jury Instructions (CALCRIM) No. 200, instructed the jurors that "if you believe the attorneys' comments on the law conflict with my instructions, you must follow my instructions." Ordinarily, we may presume that jurors would understand and follow that instruction. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1005.) Here, however, that presumption is not reasonable because, as we discuss below, the prosecutor's erroneous argument was not inconsistent, on its face, with the court's instruction and, therefore, jurors had no reason to disregard it.

Op. at 8-11.

The Court of Appeal also found there was instructional error.

> In instructing the jury, the court used the then-operative version of CALCRIM No. 570. [FN5] In relevant part, the court stated, "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or heat of passion if: one, the defendant was provoked; and, two, as a result of that provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; or, three, the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] Heat of passion does not require anger, rage or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.  [¶] In order for heat of passion to reduce a murder to voluntary manslaughter the defendant must have acted under the direct and immediate influence of provocation as I have defined it.  [¶] While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.  [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether defendant was provoked and whether the provocation was sufficient. *In deciding whether the provocation was sufficient, consider whether a person of average disposition would have been provoked and how such a person would react in the same situation knowing the same facts.* [¶]... [¶] The People have the burden of proving beyond a

10

reasonable doubt that the defendant did not kill as a result of sudden quarrel or heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder." (Italics added.)

> FN5. Thompson's trial concluded in February 2008 and CALCRIM No. 570 was revised in December 2008. The revised instruction now provides, in relevant part, "It is not enough that the defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, *consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.*" (CALCRIM No. 570 (Dec. 2008), italics added.)
> The modification cites *Najera, supra*, 138 Cal.App.4th 212, as authority for the proposition that an average person need not have been provoked to kill, but only to act rashly and without deliberation. (CALCRIM No. 570 (Dec. 2008).)

The court's instruction describes the subjective and objective elements of heat of passion. As to the latter, it instructs the jurors that the defendant must have acted as a result of provocation that "would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." (CALCRIM No. 570.) This language conveys the correct standard. (See *People v. Manriquez, supra*, 37 Cal.4th at pp. 583-584 [conduct "sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection."]

Next, the instruction tells jurors that they must decide "whether the defendant was provoked" (the subjective component) and whether "the provocation was sufficient" (the objective component). (CALCRIM No. 570.) To guide the latter determination, the instruction directs jurors to consider: (1) whether an average person would have been provoked; and (2) how an average person would have reacted under the same circumstances. Thompson challenges the propriety of the second consideration, claiming that it misstates the standard for the sufficiency of provocation. We agree that this part of the instruction could be clearer. [FN6]

> FN6. The Judicial Council apparently thought so, too. See footnote 4, *ante*.

Directing jurors to consider how an average person would react is not *necessarily* incorrect or inconsistent with the correct standard. However, the instruction does not expressly limit the jurors' focus to whether an average person would act rashly. Instead, the

11

> challenged language seems to invite jurors to consider what would and would not be a reasonable response to the provocation. More specifically, it allows, and perhaps even encourages, jurors to consider whether the provocation would cause an average person to do *what the defendant did*; i.e., commit a homicide. However, as we explained above, whether an average person would be provoked to kill is not a proper consideration in determining whether provocation was sufficient. Thus, insofar as the instructional language permits the jury to decide a crucial issue based on proper and improper considerations, it is ambiguous.
>
> The mere fact that CALCRIM No. 570 is ambiguous does not, standing alone, establish instructional error. The determinative question is whether "there is a 'reasonable likelihood' that the jury misconstrued or misapplied the law in light of the instructions given, the entire record of trial, and the arguments of counsel." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 276.)
>
> As discussed above, the prosecutor's argument in this case was essentially the same as the improper argument in *Najera.* It reflected the incorrect standard for provocation and invited a misapplication of the instructional language in CALCRIM No. 570. In addition, the trial court overruled the defense's objections to the prosecution's argument, further reinforcing the idea that the jury should consider whether the provocation in question would cause an average person to kill. The court had previously directed the jury to use the challenged instruction as an analytical tool in determining whether provocation was sufficient. Given this direction from the trial court, the instruction's ambiguity, and the prosecutor's improper and erroneous argument, we find a reasonable likelihood that the jury misunderstood how to determine the sufficiency of provocation and erroneously believed that, to be sufficient, provocation had to be such as would cause an average person to react the way Thompson did.

*Id.* at 11-14.

Despite the prosecutor's misconduct and the instructional error, the state court found no violation of Thompson's constitutional right to due process because the errors were not prejudicial.

> Thompson contends the instructions error violated his federal constitutional right to due process and, therefore, must be reviewed under the federal standard for prejudicial error set forth in *Chapman v. California* (1967) 386 U.S. 18. However, voluntary manslaughter is a lesser included offense of murder, and it is settled that failing to instruct, failing to give adequate instructions, and giving erroneous instructions on a lesser included offense constitute errors of states, not federal law. (*People v. Lasko*, *supra*, 23 Cal.4th at pp. 111-113; *People v. Blakeley* (2000) 23 Cal.4th 82, 93; *People v. Breverman* (1998) 19 Cal.4th 142, 164-179.) Thus, we review the error under the

12

standard set forth in *People v. Watson* (1965) 46 Cal.2d 818 and determine whether it is reasonably probably Thompson would have obtained a more favorable result in the absence of the instructional error.

Where there is no substantial evidence which may lead reasonable jurors to conclude that the defendant is guilty of voluntary manslaughter, rather than murder, the trial court need not instruct the jury in that lesser included offence. (*People v. Jackson* (1980) 28 Cal.3d 264, 305, disapproved on another ground in *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3.) "[T]he existence of '*any*' evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*People v. Breverman, supra*, 19 Cal.4th at p. 162.) "[I]f the evidence which supports a [lesser included offense] is 'minimal and insubstantial,' the trial court need not instruct on that [offense]." (*People v. Jackson*, *supra*, at p. 306.)

With these principles in mind, we turn to the facts of this case. We find evidence of provocation to be slight. Thompson often argued with Moore about the amount of time that Moore spent with Green, rather than with him. The night before the shooting, Thompson was angry to learn that Green was spending the night with Moore, when the two had gone shopping together using Thompson's car that same day. When he came over to Moore's house the next morning, he sat in a picnic chair in Moore's room while Moore and Green watched television and talked and laughed together. He spoke to Moore alone briefly, then after a few more minutes, got up from the chair, pulled out his gun and pointed it at Green. He pulled a trigger twice, but when the gun did not fire, he began beating Green. Moore tried to defend Green, and then as Green lay on the floor, cradled her and comforted her.  It was at this point that Thompson, after Moore refused to leave Green's side, shot Moore in the head at close range. There was no heated exchange of words, no argument, no physical altercation, no taunting, teasing or threats. These events would not have caused an """"ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment."""" (*People v. Manriquez*, *supra*, 37 Cal.4th at p. 584.)

Against this evidence of provocation, the evidence of malice and premeditation is overwhelming. Two days before the shooting, Thompson went to his friend's house and stole the gun he used to kill Moore. The night before the shooting, he called Moore and told her that Green needed to go home because he intended to come over. He then called Moore's mother and said he would shoot Green and then himself. When he went to Moore's house the next day, he had a hand-written note in his pocket, in which he had written things like "If I *cant* have her no one can," "*Im* going to miss everybody," "I did this *becous dorthy* is in the way. I *cant spin* no time with pussycat *becaus* she *allways ther*," "I

13

> hope everybody *dont for get* me," and "put *use side by sid* when we die." [FN7] When Thompson shot Moore, attempted to kill himself with both the gun and a knife and finally asked the police to shoot him, he was following through on what he had written in that note.
>
> > FN7. See footnote 3, *ante*.
>
> Since there was no substantial evidence to support the defense theory of voluntary manslaughter in the first instance, we conclude that neither the prosecutor's arguments nor the instructional error was prejudicial.

*Id.* at 14-16.

The California Court of Appeal's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law. First of all, the Ninth Circuit has held that the failure of a state trial court to instruct on lesser-included offenses in a non-capital case does not present a federal constitutional claim. *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000). However, "the defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to the general rule." *Solis*, 219 F.3d at 929 (citing *Bashor v. Risley*, 730 F.2d at 1240). *Solis* suggests that there must be substantial evidence to warrant the instruction on the lesser included offense. *See Solis*, 219 F.3d 929-30 (no duty to instruct on voluntary manslaughter as lesser included offense to murder because evidence presented at trial precluded a heat of passion or imperfect self-defense instruction; no duty to instruct on involuntary manslaughter because evidence presented at trial implied malice).

In Thompson's case, there was no "substantial evidence" to warrant the instruction on voluntary manslaughter in the first place. As the Court of Appeal discussed, the evidence for provocation was "slight": Thompson made several complaints to Moore about the amount of time she spent with Green rather than him; he was angry the night before the shooting when he learned that Green was staying the night with Moore after spending the day shopping together; on the day of the shooting, he sat in a chair while Moore and Green watched television and talked and laughed together; a few minutes after speaking briefly alone with Moore, Thompson got up from his chair and pulled out his gun and pointed it at Green; when the gun did not fire

14

after he pulled the trigger twice, Thompson began beating Green; Moore tried to defend Green, and as she lay on the floor, cradled and comforted her; when Moore refused to leave Green's side, Thompson shot her in the head at close range. Op. at 15; *see supra* at 11. The state court found that there was "no heated exchanged of words, no argument, no physical altercation, no taunting, teasing or threats," and that such events would not have caused an "'"ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment."'" *See supra* at 11. On the other hand, the evidence of malice and premeditation was "overwhelming": Thompson stole a gun from his friend's house two days before the shooting; the night before the shooting he called Moore's mother and said he would shoot Green and himself; on the day of the shooting, he went over to Moore's house with a hand-written already in his pocket in which he expressed an intent to kill himself and Moore; after he shot Moore, he attempted to kill himself with a gun and a knife, and then asked the police to shoot him when he failed. *Id.* at 16. Accordingly, to whatever degree the jury may have been mislead by the prosecution's misstatements and the instructional errors, such errors were not prejudicial because it is not likely the jury would have come to a different verdict based on the evidence presented. In light of the lack of substantial evidence to support his theory of voluntary manslaughter and the overwhelming evidence showing malice and premeditation, Thompson fails to show that the errors at issue were prejudicial and warrants habeas relief.

B.  Appealability

The federal rules governing habeas cases brought by state prisoners have recently been amended to require a district court that denies a habeas petition to grant or deny a certificate of appealability in the ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability (formerly known as a certificate of probable cause to appeal). *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a

15

constitutional right." 28 U.S.C. § 2253(c)(2). The certificate must indicate which issues satisfy this standard. *See id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

This was not a close case. For the reasons set out above, jurists of reason would not find the result debatable or wrong. A certificate of appealability will be denied. Thompson is advised that he may not appeal the denial of a COA, but he may ask the court of appeals to issue a COA under Rule 22 of the Federal Rules of Appellate Procedure. *See* Rule 11(a), Rules Governing § 2254 Cases.

## VI. CONCLUSION

The petition for a writ of habeas corpus is **DENIED**. A certificate of appealability is **DENIED**. The Clerk shall close the file.

IT IS SO ORDERED.

Dated: December 30, 2011

EDWARD M. CHEN
United States District Judge

16